# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WYDELL D. JONES,<br><br>                              Petitioner,<br><br>                vs.<br><br>JOHN MARSHALL,<br><br>                              Respondent. | Civil No.        10-0376 MMA (BGS)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**(1) DENIAL OF REQUEST FOR EVIDENTIARY HEARING; and**<br><br>**(2)  DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

## I.      INTRODUCTION

Petitioner Wydell Jones, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in San Diego County Superior Court case number SCD202155 for residential burglary, mayhem, and assault with force likely to produce great bodily injury. (Lodgment No. 1, vol. 2 at 0216-26.) The jury also found true allegations that the burglary occurred in an inhabited dwelling, another person was present in the residence at the time of the burglary, Jones personally inflicted great bodily injury, and that Jones had served two prior prison terms.  (*Id.*)  The petition presents seven claims.  (*See* Pet. at 19-48, Supp. to Pet.[1])

/ / /

/ / /

---

[1]  For ease of reference, the Court will use the page numbers assigned by the Court's electronic filing system.

This case is before the undersigned Magistrate Judge pursuant to S.D. Cal. Civ. R. 72.1(d)(4) for Proposed Findings of Fact and Recommendation for Disposition.  For the reasons set forth below, the Court respectfully recommends that the Petition be **DENIED**.

## II.      FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C.. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are taken from the California Court of Appeal's opinion denying Jones's direct appeal of his convictions.

### A. *The People's Case*

Ashley began dating Jones when she was 18 years of age.  After they dated for a couple of months, Jones asked her to engage in prostitution, and Jones acted as her pimp.  Ashley lived with him on and off for about a year and a half.

In June 2006 Jones introduced Ashley to his friend Devon Hanzy, who was living with his girlfriend Mia Martin in an apartment in the Golden Hills area of San Diego.  Ashley made plans to go to Martin's apartment on June 28 of that year.  Ashley testified that on June 26, 2006, after arguing with Jones about his daughter, she ended her relationship with him and moved out.

Two days later, on June 28, Ashley went to Martin's apartment as planned and ended up spending the night there.  Martin's boyfriend, Hanzy, was also there.  Someone knocked on the door while Ashley slept on the couch.  Martin got up, checked the door, saw that it was Jones, and told Ashley.

Ashley ran to the back bedroom, looked out the window and saw Jones's black Mercedes parked outside the building.  Jones kept knocking and saying, "Open the door."  Jones then broke a window and climbed in through it.  When Ashley heard the glass break, she ran into the bedroom, hid in the closet, and rolled herself into a ball.  Jones found Ashley in the closet and kicked her with boots in the head and in the side of her body.

Ashley ran out of the closet and got in the bed, where Jones punched her in the head at least 10 times.  The punches struck the back of her head, the side of her face, and her eyes.  Ashley stood up, and Jones continued to punch her in the eyes, both of which started to bleed.  She was also bleeding from a cut above her left eye.  She fell on the floor, and Jones kicked and punched her in her ribs and face.  When she got up and ran to the living room, Jones followed her and kept punching her.  Ashley testified she screamed to Hanzy for help, and Hanzy told Jones to leave.  Jones asked Hanzy, "Are you helping this bitch?"  Jones then punched Ashley again and left.  Hanzy helped Ashley to the bed and put a towel on her eyes, which were bleeding.

/ / /

As Jones was beating Ashley, Martin went to a neighbor's apartment and used the neighbor's telephone to call 911. The audiotape of Martin's 911 call was played for the jury. During that call, Martin stated, "I need the police. My friend is being beat[en] up by her boyfriend in my house." After stating where she lived, Martin said, "I need an ambulance and I need the police now." When she was asked where the boyfriend was, Martin answered, "He's in my house. He just broke down my window. He came through my fucking window." Martin described the boyfriend as Black, about five feet two or three inches in height, and about 30 or 35 years of age. She also stated she could hear a woman named Ashley being "pounded on by . . . some . . . guy." When asked what part of Ashley's body had been injured, Martin replied that she heard Ashley "saying something about her eye bleeding."

San Diego Police Officer Kerry Bauman testified he responded to Martin's 911 call at around 3:15 a.m. on June 29. When he arrived at Hanzy's apartment, the window was broken, and there was glass on the floor. When Officer Bauman contacted Ashley in the bedroom, Ashley's eyes were swollen shut, she had a laceration above her left eyebrow, and she was scared. Every time someone came in through the bedroom door, Ashley jumped, afraid Jones had returned.

Ashley was transported by ambulance to the emergency room at the UCSD trauma hospital (UCSD). She had suffered traumatic injuries to her face and had considerable swelling around her right eye, blurry vision, and a cut on her left eyelid. She was nauseous from the pain, her right eye was bulging, blood was collecting behind the eye and causing pressure on the optic nerve, and she had a corneal abrasion on her left eye. A CT scan revealed fractures to the orbital walls, medial wall and inferior orbital wall. A piece of the inferior orbital wall had broken off and fallen into the sinus area. Ashley had suffered multiple fractures behind her right eye, and one of the injuries was a "blowout" orbital floor fracture, in which a large pieced of orbital bone broke and fell into her cheek. The white part of Ashley's right eye and the socket behind the eye were bleeding. Ian Grover, M.D., an emergency medicine physician and UCSD, and Terence Davidson, M.D., a surgeon at UCSD, both opined that Ashley's injuries were consistent with her report of having been assaulted and repeatedly punched in the face.

Ashley received about eight hours of treatment in the UCSD emergency department, and she remained in the hospital for two and a half days. Jones called her twice while she was in the hospital and three times after she was discharged. Jones told her not to testify and not to put him in jail because he did not deserve to go to jail. Ashley testified that Jones offered to give her money, a car, and use of his apartment if she did not testify against him. Ashley still feared him when he called her at the hospital.

In July 2006 San Diego Police Detective Renee Saffles interviewed Martin about the incident. Martin indicated she looked out the apartment window blinds, saw Jones outside the door, and told Ashley, who ran into the bedroom and hid in the closet. In the course of the investigation, Detective Saffles learned that Jones was the perpetrator.

In early August 2006 Dr. Davidson performed reconstructive surgery on Ashley's right eye. The surgery was delayed until August because of the bleeding behind the eye.

Photographic evidence showed Ashley had bruising and shoe marks on her body where Jones had kicked her. At the time of trial, she had a scar above her left eye from the cut she suffered, and she had a scar beneath her right eye from the surgery. As a result of the assault Ashley suffered permanent vision impairment, and she now wears glasses.

/ / /

3

10cv0376

Karen-Anne Tenney, a patrol lieutenant with the San Diego Police Department, arrested Jones in January 2007. When he was seated in the back seat of the police car, he leaned against the door, hung his head, and said, "I done screwed up my life."

B. *The Defense*

Jones and his wife Jula Jones (Jula) [footnote omitted] testified in his defense. Their testimony indicated that Jones's defense was that Ashley accidentally injured herself, Jula injured her, or both.

Jones testified he met Jula in 1997. They married in 2005. Jones met Ashley before he married Jula. He saw Ashley walking down a street near 36th and El Cajon Boulevard as he was driving by, and he gave her a ride in his car. After Ashley asked him for money for a hotel room, Jones gave her money in exchange for sex. Ashley called him a couple of times. She wanted to know whether he wanted to date her, and he took her up on the offer. She spent the night at his apartment a few times when she did not have a place to stay or when he needed a babysitter for his children. He allowed Ashley to store a pillowcase full of clothing at his apartment for almost a week in June 2006, and sometimes she showered there, but he never provided her with a key to the apartment. Jones admitted he once dated Ashley after he married Jula, but he denied that Ashley was his girlfriend or that she lived at his apartment. Jones contradicted Ashley's testimony that he and Ashley lived together for two years, they had sex all the time, and he was her pimp.

Jones testified that when he and Jula arrived at the apartment complex on June 28, he pulled into the back parking lot near Hanzy's apartment. He honked his horn, got out of the car, and whistled for Hanzy. He noticed the security gate was jimmied with a piece of wood, so he went through the gate and walked up the stairs to Hanzy's apartment.

Hanzy let him in through the screen door. Martin and Ashley came out of a back room, Ashley looked outside at Jones's car and asked "who was that bitch in the car?" Jones responded, "That's not a bitch. That's my wife." When Ashley said, "Oh, that's the bitch that was talking shit on the phone from Vegas," Jones told her she should "watch [her] mouth." Ashley replied, "I'm going to beat that bitch's ass."

Jones stated that Ashley then picked up a wooden rack that looked like a miniature ladder and said, "She ain't gonna leave in that car or I'm gonna bust your windows out." Out on the porch area, Jones grabbed her arms to take the wooden rack from her, and the rack struck one of the apartment windows and broke it when Ashley moved back trying to keep Jones from taking the rack from her. Jones stated he never climbed through the window. He pulled Ashley down to the floor away from the window so they would not get cut by the broken glass. Jones took the wooden rack out of Ashley's hand and apologized to Hanzy for the broken window. When asked on cross-examination whether he saw Ashley hit her face on anything during what he called the "scuffle," Jones was unable to say that he did.

Jones stated that Ashley walked downstairs in the direction of Jones's car. The next time he saw Ashley, she was outside the gate attacking Jula. Both were on the ground, with Ashley on top of Jula. Jula was defending herself, and both women were swinging their arms wildly. Jones grabbed Ashley by the shoulders, pulled her away from Jula, and slung her to the ground. Jones, however, did not see Ashely's face hit the ground. On cross-examination, Jones stated he never punched Ashley in the eye.

/ / /

4

10cv0376

Jones testified he asked Hanzy to grab Ashley so he could leave. Hanzy was concerned that the police were going to come and that he and Jones would be going back to prison for a parole violation. Hanzy stepped between Jones and Ashley, who swore and told Jones he was going to jail. Jones and Jula got into the car and drove away.

Jones admitted he spoke to Ashley on the telephone while she was in the hospital. He testified, however, that Ashley told him in those conversations that she would not inform his parole officer about the June 28 incident if he gave her his Mercedes, let her stay at his apartment, and paid the rent.

Jula's version of the events differed from Jones's. Jula testified that she heard a commotion and the sound of glass breaking as she waited in the car for Jones. She heard Ashley say she broke the window, and she was going to do whatever she had to, including break the windows in Jones's car and apartment, for him to be with her. Jula got out of the car and walked to the staircase. She saw Ashley waving an object around in her hand.

Jula stated she asked Ashely what was going on. Ashley asked Jones, "Who in the fuck is this bitch?" When Jones answered that Jula was his wife, Ashley said to Jula, "It is over for you. I'm through. I'm going to fucking kill you." Ashley threw the object at Jula, who ducked and tried to run. Ashley tripped and hit her head as she was running down the stairs after Jula. Ashley got up and tackled Jula, and both women fell, with Ashley on top of Jula. Ashley said, "Oh shit. My eye." She then said, "Now I'm really going to get you," and "I'm going to do whatever it takes for you to leave him alone."

Jula stated she cried out to Jones for help. Jones came and pushed Ashley off of Jula, but he did not hit Ashley. Jula told Ashley she was going to call the police and have Ashley arrested. Ashley replied, "I don't care. I'm going to fuck you up." Jula stated she put her fingernails in Ashley's eyes to defend herself. Jula pressed so hard on Ashley's eyes that two of her nails broke. Jones grabbed Jula by the arm and they left.

(Lodgment No. 6 at 3-10.)

## III.    PROCEDURAL BACKGROUND

On March 13, 2007, the San Diego County District Attorney filed an amended information charging Wydell Jones with one count of residential burglary, a violation of California Penal Code §§ 459 and 460 (count one), one count of mayhem (count two), a violation of Penal Code § 203, one count of corporal injury to a spouse or roommate (count three), a violation of Penal Code § 273.5(a), and assault by means likely to produce great bodily injury (count four), a violation of Penal Code § 245(a)(1). (Lodgment No. 1, vol. 1 at 6-8.) As to count one, the amended information alleged that the residence was occupied during the commission of the burglary, within the meaning of Penal Code § 667.5(c)(21). (*Id.*) As to counts one, three and four, the amended information alleged that Jones had personally inflicted great bodily injury on the victim, within the meaning of Penal Code §§ 12022.7(e) and 1192.7(c)(8). (*Id.*) The amended information also alleged Jones had suffered a number of prior

1

2   convictions, including four prior convictions which made him ineligible for probation, within the

3   meaning of Penal Code § 1203(3)(4), and two prior convictions for which e he served a prison sentence,

4   within the meaning of Penal Code §§ 667.5(b) and 668. (*Id.* at 7-8.)

5          Following a jury trial, Jones was convicted of residential burglary, mayhem and assault by means

6   likely to produce great bodily injury, counts one, two and four. (Lodgment No. 1, vol. 2 at 216-28.)

7   The jury also found true all the allegations and enhancements and found that Jones had suffered the prior

8   convictions as charged. (*Id.*) Jones was sentenced to eleven years in prison. (*Id.* at 477-78.)

9          Jones appealed his conviction to the California Court of Appeal.[2] (*See* Lodgment Nos. 3, 5.)

10  While his direct appeal was pending, Jones filed a petition for writ of habeas corpus in the California

11  Supreme Court on April 16, 2009. (Lodgment No. 9.) The state appellate court denied his direct appeal

12  in an unpublished opinion on May 15, 2009. (Lodgment No. 6.) On June 25, 2009, Jones filed a

13  petition for review in the California Supreme Court. (Lodgment No. 7.) Jones filed two supplements

14  to the habeas corpus petition he filed in the California Supreme Court while the two petitions were

15  pending. (Lodgment Nos. 10, 11.) On September 9, 2009, the California Supreme Court denied the

16  petition for review and the habeas corpus petition in two separate orders. (*See* Lodgment Nos. 8, 12.)

17  Neither denial cited any authority. (*Id.*)

18         On February 16, 2010, Jones filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §

19  2254 in this Court. (Doc. No. 1.) Respondent filed an Answer and Memorandum of Points and

20  Authorities in Support of the Answer on April 26, 2010. (Doc. No. 10.) Jones filed a Traverse on July

21  19, 2010. (Doc. No. 19.)

22  **IV.   DISCUSSION**

23         A.   *Standard of Review*

24         This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act

25  of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will

26  not be granted with respect to any claim adjudicated on the merits by the state court unless that

27

28         [2] The state appellate court remanded the matter to the trial court to correct inconsistencies in how Jones's
    name appeared on various court documents. (*See* Lodgment No. 6 at 31.) This issue is not relevant to the claims
    asserted in Jones's petition.

adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  Additionally, the state court's factual determinations are presumed correct, and Jones carries the burden of rebutting this presumption with "clear and convincing evidence."  28 U.S.C.A. § 2254(e)(1).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*  Clearly established federal

1

2  law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme

3  Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

4       B.    *Analysis*

5       Jones alleges seven claims in his petition.  First, he claims trial counsel rendered ineffective

6  assistance of counsel, in violation of his Sixth Amendment rights.  (Pet. at 19-24.).  Second, he argues

7  the trial court impermissibly restricted his right to cross examine the witnesses against him and to

8  present evidence in his defense, in violation of his Sixth Amendment rights.  (Pet. at 25-33.)  Third, he

9  contends the trial judge violated his right to a fair trial when he refused to appoint counsel for him.  (Pet.

10  at 34-37.)  Fourth, he claims the trial court refused jury instructions on his theory of his defense,

11  violating his right to a fair trial.  (Pet. 38-41.)  Fifth, he argues the reasonable doubt instruction that was

12  given to the jury was insufficient and violated his right to a fair trial.  (Pet. at 42-48.)  Sixth, he contends

13  his appellate counsel rendered ineffective assistance of counsel.  (Supp. to Pet. at 2-15.)  Seventh, he

14  claims the imposition of the aggravated term for his sentence violated his Sixth Amendment right to

15  have any fact that increases a defendant's sentence beyond the statutory maximum proven to a jury

16  beyond a reasonable doubt, pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny.

17  (Supp. to Pet. at 16-31.)  Jones also asks for an evidentiary hearing.  (Traverse at 24.)

18       Respondent counters that the state court's denials of the claims were neither contrary to, nor an

19  unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer

20  at 9-19, 24-30.)  As to claim four, Respondent also contends it fails to state a claim upon which federal

21  habeas relief can be granted.  (*Id.* at 19-24.)  Respondent has not addressed Jones's request for an

22  evidentiary hearing.

23       1.    *Request for an Evidentiary Hearing*

24       Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the

25  district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th

26  Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

27            (2) If the applicant has failed to develop the factual basis of a claim in State court
            proceedings, the court shall not hold an evidentiary hearing on the claim unless the
28            applicant shows that –

            (A) the claim relies on –

1
2
3
4

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

5
6

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

7
8

28 U.S.C.A. § 2254(e) (2).

9

The Ninth Circuit has outlined the procedure for deciding whether to grant a request for an

10

evidentiary hearing.  First, the court must "determine whether a factual basis exists in the record to

11

support the petitioner's claim."  *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing

12

*Baja*, 187 F.3d at 1078).  If not, the court must "ascertain whether the petitioner has 'failed to develop

13

the factual basis of the claim in State court.'"  *Id.* at 669-70.  A failure to develop the factual basis of

14

a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner

15

or the prisoner's counsel."  *See Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The Supreme Court has

16

said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary

17

hearing in state court in the manner prescribed by state law."  *Id.* at 437.  If the petitioner has failed to

18

develop the factual basis for his claim in state court, "the court must deny a hearing unless the applicant

19

establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)."  *Insyxiengmay*,

20

403 F.3d at 669-70.

21

If, however, the petitioner "has not 'failed to develop' the facts in state court, the district court

22

may proceed to consider whether a hearing is appropriate, or required under *Townsend [v. Sain,* 372

23

U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)]."  *Id.* at 670.  In *Townsend*, the Court identified six

24

situations in which a habeas petitioner would be entitled to an evidentiary hearing:

25
26
27

(1) [T]he merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that state trier of fact did not afford the habeas applicant a full and fair fact hearing.

28

*Townsend*, 372 U.S. at 313, *overruled on other grounds Keeny v. Tamayo–Keyes*, 504 U.S. 1 (1992),

9

1    *superceded in part by statute*, 22 U.S.C. 2254(e)(2) (1996).

2         Thus, if a petitioner has not failed to develop the factual basis for his claim, he is entitled to an

3    evidentiary hearing in federal court if he meets one of the *Townsend* factors and makes allegations

4    which, if true, would entitle him to relief.  *See Insyxiengmay*, 403 F.3d at 670; *see also Gonzalez v.*

5    *Pliler*, 341 F.3d 897, 903 (9th Cir. 2003).

6         In the present case, a sufficient factual basis exists in the record.  The trial transcripts and other

7    records provide enough information for the Court to resolve the merits of Jones's claims.  *See*

8    *Insyxiengmay*, 403 F.3d at 669-70.  Even if this were not so, Petitioner would not be entitled to an

9    evidentiary hearing because he failed to develop his claims in state court.  There is no indication in the

10   record that he requested an evidentiary hearing on his claims in state court.  (*See* Lodgment Nos. 9, 10,

11   11.)  Accordingly, Jones's request for an evidentiary hearing is **DENIED**.

12         2.    *Ineffective Assistance of Counsel (claim one)*

13        Jones argues his trial counsel was ineffective in four ways.  First, he contends counsel twice

14   failed to serve the attorney general with her motion to recuse the District Attorney's Office, which

15   resulted in the motion being denied on procedural grounds.  (Pet. at 7; Traverse at 5-6.)  Second, he

16   claims counsel improperly cited a case to the court when arguing the motion to recuse.  (Pet. at 7;

17   Traverse at 5-7.)  Third, he alleges that counsel did not turn over the birth dates of defense witnesses

18   in a timely manner, causing the trial judge to "chastise" her.  (Pet. at 8; Traverse at 7-9.)  Fourth, he

19   claims counsel did not submit jury instructions, as directed by the trial judge, in a timely manner.  (Pet.

20   at 8; Traverse at 8-9.) Respondent argues the state court's denial of the claim was neither contrary to,

21   nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp.

22   Answer at 9-11.)

23        According to Respondent, Jones raised this claim in the habeas corpus petitions he filed in the

24   California Supreme Court.  (Answer at 2, ¶ 3.)  Although the Court has been unable to locate this claim

25   in lodgments submitted to this Court by Respondent, the Court will address the merits of the claim.  *See*

26   *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (stating that a Court may deny a habeas petition

27   containing an unexhausted claim if it is "perfectly clear that the applicant does not raise even a colorable

28   claim").

10cv0376

To prevail on a claim of ineffective assistance of trial counsel in federal court, Jones must have first established in state court that his trial counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689. Second, he must have shown counsel's deficient performance prejudiced the defense, such that the result of the proceeding would have been different absent counsel's errors. *Id.* at 687. On federal habeas review, "the question is not whether counsel's actions were reasonable, [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Court need not address the performance prong if the claim can be resolved on the ground of lack of sufficient prejudice. *Strickland*, 466 U.S. at 697.

Jones's first and second ineffective assistance of counsel claims relate to the motion to recuse the District Attorney's Office. Counsel filed the motion after Jones's cell was searched at the direction of the prosecutor following Jones's phone call to the victim. (Lodgment No. 2, vol. 1 at 21-24.) Jones first claims counsel was ineffective when she failed to properly serve the Attorney General with the recusal motion, which is required by statute. (Pet. at 21-24.) Jones next argues counsel was ineffective because she improperly cited cases in the memorandum of points and authorities in support of the motion to recuse. (Pet. at 21-22.) Specifically, Jones notes that counsel did not provide the full citation to one case and cited another case on which the California Supreme Court had granted review, rendering it not citable under California Rules of Court, rule 8.1105(e)(1). (*Id.*) Jones claims he suffered prejudice from counsel's actions because, as a result, she "lost the faith and confidence of the trial judge [and] she also lost the respect of her counterpart the prosecutor." (Pet. at 23.) As Respondent points out, Jones has not established sufficient prejudice to satisfy *Strickland*'s standard. Jones has not provided this Court with any evidence that shows the recusal motion would have been granted had counsel properly served it or properly cited cases in support of her motion. In short, Jones has not established that, had the motion been granted, the result of the trial would have been different. *Strickland*, 466 U.S. at 687.

1    Jones also claims defense counsel was ineffective when she failed to turn over birth dates of

2    three defense witnesses to the prosecutor in a timely manner, resulting in the trial judge "chastis[ing]

3    her and order[ing] her to remain in the courtroom until she turned over the information." (Pet. at 22;

4    Lodgment No. 2, vol. 2 at 356-57.) Defense counsel was required to turn over the birth dates of

5    witnesses under California discovery law, which enabled the prosecutor to run the witnesses' "rap sheet"

6    in order to discover impeachment material in the form of convictions. When the prosecutor complained

7    to the trial judge about defense counsel's failure to disclose the birth dates, the trial judge ordered

8    defense counsel to remain in the courtroom until she turned over the information. (Lodgment No. 2, vol.

9    2 at 356-57.) Jones claims he was prejudiced by counsel's actions because this resulted in the trial judge

10   losing faith and confidence in counsel and the prosecutor losing respect for counsel. (Pet. at 23.) Jones

11   also claims he was prejudiced because counsel's "failure to secure from her investigator the requested

12   information among her other failings is a testament to her failure to conduct the minimum necessary

13   investigation to be aware of the witnesses she wished to call and what the could possibly and probably

14   testify to." (Pet. at 23.)

15   As discussed above, losing the trial court's faith and confidence, as well as the respect of the

16   prosecutor, does not amount to sufficient prejudice to satisfy *Strickland*'s standard because Jones has

17   provided no evidence that, had counsel turned the birth dates over in a timely manner, the result of the

18   trial would have been different. *Strickland*, 466 U.S. at 687. Moreover, Jones's claim that counsel's

19   failure to turn over the birth dates in a timely manner indicates counsel did not perform sufficient

20   investigation is not supported by any evidence. In fact, counsel indicated to the trial court that the

21   witnesses would testify that they knew all the women Jones was dating, that he was not dating the victim

22   Ashley Cain at the time of the crime, and that Jones was a "john" and not a "pimp." (Lodgment No. 2,

23   vol. 3 at 386-87.) Under these circumstances, this Court cannot say that the state court's conclusion that

24   Jones did not establish counsel was deficient or that he suffered prejudice under *Strickland* was

25   unreasonable. *See Harrington*, 131 S. Ct. at 788.

26   Jones also contends defense counsel was ineffective when she "failed to comply with the court's

27   request that both attorneys submit jury instructions for the court's consideration prompting another

28   admonishment from the court." (Pet. at 22.) Jones claims the prejudice he suffered was, again, the

1   "[loss] of faith and confidence of the trial judge [and the loss of] . . . respect from her counterpart the

2   prosecutor."  (Pet. at 23.)  As with Jones's previous ineffective assistance of counsel claims, he has

3   failed to establish sufficient prejudice under *Strickland*.  *Strickland*, 466 U.S. at 687.  Jones has not

4   stated what, if any, instructions were not given as a result of any failings by counsel, or how the result

5   of the trial would have been different had counsel provided jury instructions to the trial judge when

6   asked.  Indeed, there do not appear to have been any defense generated jury instructions that were

7   refused by the trial court.  (*See* Lodgment No. 1, vol. 1 at 172-207; Lodgment No. 2, vol. 4 at 597-618.)

8          For all the foregoing reasons, the state court's denial of Jones's ineffective assistance of counsel

9   claims was therefore neither contrary to, nor an unreasonable application of, clearly established Supreme

10  Court law.  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Harrington*, 131 S. Ct. at 788.  He is not

11  entitled to relief as to these claims.

12          3.      *Violation of Jones's Right to Cross Examine Witnesses and Present Evidence (claims*

13                  *two and two(A))*

14         Jones argues the state court violated his Sixth Amendment right to confront the witnesses against

15  him when it prevented defense counsel from cross examining Cain about being a prostitute before she

16  met Jones and excluded evidence about prior injuries to Cain's face and eyes.  (Pet. at 25-27; Traverse

17  at 9-15.)  Defense counsel sought to introduce this evidence, via cross examination of Cain, to counter

18  Cain's claim that Jones had introduced her to prostitution.  (Pet. at 25-27.)  Jones contends he was

19  prejudiced by this exclusion because he was unable to fully challenge Cain's credibility, which, Jones

20  contends, was the heart of the prosecution's case.  (*Id.*)  Second, Jones contends that his due process and

21  fair trial rights were violated when the trial court prevented him from introducing testimony from Lanise

22  Glenn, a friend of Cain's.  (Pet. at 25-33.)  According to Jones, Glenn would have testified she traveled

23  to Los Angeles with Cain for the purpose of prostitution before Cain met Jones and that Cain had prior

24  injuries to her eyes as a result of assaults from her mother and a boyfriend.  This evidence, Jones argues,

25  would have called into doubt Cain's credibility with regard to her claim that Jones introduced her to

26  prostitution and whether Jones had inflicted the injuries which formed the basis for the mayhem and

27  assault with force like to produce great bodily injury allegations.  (Pet. at 29-32.)  Glenn would also

28  have testified that Cain told her she had been injured in her face and eye areas by her mother two years

1   before the attack by Jones and by her boyfriend one year before the attack by Jones.  (*Id.*)

2        As to the first part of this claim, Respondent counters that the state court's denial of this claim

3   was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

4   (Mem. of P. & A. Supp. Answer at 11-15.)  Respondent claims the second portion of this claim is

5   incomprehensible and lacks factual support.  (*Id.* at 15-16.)

6        Jones raised the claims relating to Cain's alleged prior prostitution in the petition for review he

7   filed in the California Supreme Court.  (Lodgment No. 7.)  The state supreme court denied the petition

8   without citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" to the

9   state appellate court decision as the basis for its analysis.  *Ylst*, 501 U.S. at 801-02.  As to Jones's claims

10  regarding Glenn's testimony about prior injuries to Cain's face, Jones raised the claim in the habeas

11  corpus petition he filed in the California Supreme Court, which denied the petition without citation of

12  authority.  (Answer at 2; Lodgment No. 12.)  Because there is no opinion to which this Court can "look

13  through"  for its analysis of the claim, the Court must conduct an independent review of the record to

14  determine whether the state court's denial was contrary to, or an unreasonable application of, clearly

15  established Supreme Court law.  *Himes*, 336 F.3d at 853.

16        a.    *Restriction of Cross Examination and Exclusion of Evidence Relating to Cain's Prior*

17              *Prostitution*

18        During cross examination of victim Cain, defense counsel attempted to ask her questions about

19  whether she was friends with Lanise Glenn.  The prosecutor objected, and the judge took a recess.

20  (Lodgment No. 2, vol. 2 at 298-99.)  During the recess, defense counsel told the judge that she wanted

21  to ask Cain about her friendship with Glenn, whether they had traveled together to Los Angeles to

22  engage in prostitution before Cain met Jones and whether Cain had suffered prior injuries to her facial

23  and eye area which could explain the extent of injuries she suffered.  (*Id.* at 299-302.)  The prosecutor

24  objected, stating that there had already been a large amount of evidence presented establishing Cain's

25  prostitution activities.  (*Id.* at 304-06.)  After a thorough discussion, the trial judge ruled as follows:

26        THE COURT: All right.  This is a [California Evidence Code section] 352 issue.
          With respect to going into whether or not she went up to Los Angeles to prostitute with

27        Lanise, I am ruling that as completely irrelevant.  And if not completely irrelevant, I am
          excluding it under 352.

28
          The only relevance regarding the fact the victim has engaged in prostitution is
          because, as I indicated previously, prostitution has been deemed an act of moral turpitude

and is relevant for purposes of impeachment. That's come out. She's admitted to it. She was a prostitute. She engaged in prostitution. The jury is well aware of that. It is already admitted, and therefore its relevance has now — there's no further relevance in going into any details of her act of prostitution. And under 352 I am excluding that.

The nature of the relationship between the two of them is only relevant on the 273.5[3] charge and, again, cohabiting in an intimate relationship as defined by the law.

As I've already indicated, the victim has been clear about what her belief, in understanding the testimony, is regarding that relationship. Whether or not the defendant ever did pay her for sex — whether at the beginning of that relationship, middle or end of the relationship — has very, very limited relevance to rebutting a claim they had an intimate relationship, boyfriend-girlfriend relationship. She's testified to that.

And I understand that you want to challenge that, but bringing out the fact that — even if assuming she says yes — which you don't know what the answer is going to be, so we're just speculating — but even assuming she said, "Yes, he did pay me on occasion for sex," that doesn't rebut what she's already said. "And we also had, in my opinion, a boyfriend-girlfriend relationship. We spent time together. I loved him," et cetera.

Now, again, if you want to put the defendant on to say that's not the case — we did not have that type of relationship; I was strictly her john or strictly her pimp — you are free to do that. I will not preclude you from doing that. But at this point there is very limited relevance in going further into it with the victim. It does not impeach her testimony or rebut her testimony.

(*Id.* at 306-07.)

When defense counsel argued further that bringing out information that established Cain had engaged in prostitution before meeting Jones impeached her credibility because she testified that Jones introduced her to prostitution, the trial judge stated:

THE COURT: Well, maybe that's impeachment on a collateral issue. What is really important is what happened the night of June 29. There is some relevance, again for impeachment purposes, as to the prostitution, but any other impeachment on collateral issues is — has very limited relevance. We've gone beyond that by going into the detail. The jury, as I've indicated, knows she was a prostitute. We don't need to go into the details of her prostitution activity.

(*Id.* at 308.)

Jones attacked the trial court's ruling on direct appeal. The state appellate court's opinion, to

---

[3] Penal Code § 273.5(a), with which Jones was charged, states:

Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of he or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment.

which this Court must defer under *Ylst*, 501 U.S. at 805-06, addressed the exclusion of evidence claim

as follows:

> We reject Jones's contention that the court's ruling denied him his due process right to present a defense. With respect to her prostitution activities, Ashley testified on cross-examination by defense counsel that she and Jones did not have sexual relations the first night they met. Jones, however, later testified that they did, he paid her, and one of his friends also paid her for sex that night. Thus, Jones challenged her credibility through his own testimony. The court also admitted ample evidence showing that Ashley worked as a prostitute. On cross-examination, Ashley testified that she and Jones "started [as] boyfriend and girlfriend," and then "it changed." When defense counsel asked her, "What changed?," Ashley replied that Jones "turned me on to something else" after about a month. Counsel then asked: "When you said he turned you on to something else, what was the something else he turned you on to?" Ashley answered: "Prostitution."
>
> When defense counsel asked whether she ever contributed to living expenses, Ashley indicated she gave money to Jones. When asked how much money she gave him, Ashley replied: "Whatever I made." When asked how long she was Jones's prostitute, Ashley stated "on and off," which meant "like maybe three months I'll do it, and then I would maybe stop for a month or two." She explained that they "had a relationship," and he was her pimp and her boyfriend. During his cross-examination by the prosecutor, when asked about something else, Jones blurted out, "She goes out and has sex with men." We conclude that Jones had a meaningful opportunity, as a part of his defense, to challenge her credibility by presenting evidence that Ashley charged him money for sex on the night she met him and contradicting her claim that he introduced her to prostitution.

(Lodgment No. 6 at 22-23.)

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (quoting *Pointer v. Texas*, 380 U.S. 400 (1965).) The *Davis* Court noted that the right of confrontation means more than mere physical confrontation, but also includes testing the witness through cross-examination. *Id.* The right to confront witnesses, however, is not absolute, as the Supreme Court noted in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986):

> Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, *supra*, at 316-317, 94 S.Ct., at 1110 (citing *Greene v. McElroy*, 360 U.S. 474, 496 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)). It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause
>
> guarantees an opportunity for effective cross-examination, not cross-examination that

1

2

is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original).

3

*Id.* at 678-79.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

It is true that evidence Cain was involved in prostitution before she met Jones would have impeached her claim that Jones introduced her to prostitution. But, as both the trial court and the appellate court noted, that information was of such minimal relevance to the case that the state trial court was well within its power to restrict further inquiry into this area under *Van Arsdall*. The jury was called upon to decide two basic issues — whether Jones inflicted the injuries on Cain and whether Jones and Cain were cohabitants within the meaning of Penal Code section 273.5(a). Jones's defense was essentially that Cain's injuries were the result of the fight between her and Jula, Cain's fall, or both. The answers to the question whether Cain engaged in prostitution before or after she met Jones, or whether she lied about when she began engaging in prostitution, did not go to the heart of either the prosecution's case or the defense. As the Court in *Van Arsdall* noted, a defendant establishes a Sixth Amendment Confrontation clause error when he or she establishes that "[a] reasonable jury might have received a significantly different impression of [Cain's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Id.* at 680. That is not what occurred here. While evidence Cain was a prostitute before she met Jones may have dispelled any notion that she was innocently drawn into prostitution by him, it did nothing to impeach her credibility regarding the central questions of what occurred the night of June 29, 2006 and whether she cohabited with Jones.

21

22

23

24

25

26

27

28

In any event, even if the restriction of Cain's cross examination violated Jones's confrontation clause rights, any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993) because it did not have a "substantial and injurious effect or influence on the jury's verdict." *Brecht*, 507 U.S. at 638. Cain testified that while she was sleeping at Mia Martin's apartment, she heard a knock on the door. (Lodgment No. 2, vol. 2 at 229.) She woke Martin, who looked out the window and told her it was Jones. (*Id.*) Cain then looked out the back window and saw Jones's car parked in the alley. (*Id.*) Cain then heard the window being broken and ran into the bedroom closet. (*Id.* at 229-30.) Jones eventually discovered her in the closet and beat and kicked her. (*Id.* at 231-38.) Cain's testimony was corroborated

in important details by Martin and Detective Renee Saffles.  Martin testified she was sleeping in her apartment on June 29, 2006 when she heard a window being broken around 3:00 a.m.  Cain was sleeping on the couch in the living room.  (*Id.* at 177-79.)  Martin ran out of the apartment, called 911 from a neighbor's phone, and told police Cain's "boyfriend" was breaking into her apartment and beating Cain up.  (*Id.* at 13-18.)  Officer Renee Saffles testified she interviewed Martin on July 5, 2006.  Martin told her she looked through the window blinds after hearing the window break and saw Jones outside.  (*Id.* at 348.)  When Martin told Cain that Jones was outside, Cain ran into the bedroom and hid in the closet.  (*Id.*)  Dr. Terrence Davidson testified Cain's injuries were consistent with being hit in the face in the manner Cain described being beaten.  (*Id.* at 207, 215-16.)  Police Lieutenant Karen-Anne Tenney testified that when Jones was arrested, he leaned his head against the door and said, "I done screwed up my life."  (Lodgment No. 2, vol. 4 at 699-700.)

Given the above, even if Jones had established that Cain was a prostitute before she met him and that she lied about Jones introducing her to prostitution, this information did not seriously call into question the weight of the evidence establishing Jones beat Cain, causing the injuries she sustained.  At most, it cast doubt on Cain's claim that she and Jones were in a boyfriend/girlfriend relationship and were cohabiting, a point not lost on the jury as they could not reach a verdict on the charge of assault on a cohabitant.  (*See* Lodgment No. 1 at 216; Lodgment No. 2, vol. 6 at 859.)

With regard to Jones's claim that his due process and fair trial rights were violated by the exclusion of Glenn's testimony that she traveled to Los Angeles with Cain to engage in prostitution before Cain met Jones, Jones is also not entitled to relief.  A state court's erroneous evidentiary ruling cannot form the basis for federal habeas relief unless federal constitutional rights are affected.  *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000) (citing *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir.1987)).  "'The state court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due process rights.'"  *Id.* (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.1985), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985)).  The Ninth Circuit has identified five factors a court should consider when deciding whether a court's exclusion of defense evidence violates the Constitution: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence

on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." *Id.* (citing *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990)); *see also LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000) (stating that Ninth Circuit precedent serves as relevant persuasive authority in determining whether a state court decision is objectively unreasonable); *Duhaime v. DuCharme*, 200 F.3d 597, 600-01 (9th Cir. 1999) (same).  The court "'must then balance the importance of the evidence against the state interest in exclusion.'" *Whelchel*, 232 F.3d at 1211 (citing *Tinsley*, 895 F.2d at 530).

The first factor weighs against admission of the evidence.  Glenn's claim that Cain was a prostitute before she met Jones shed very little light, if any, on the question of whether Jones entered Martin's apartment with the intent to assault Cain, whether her injuries constituted mayhem, and whether Jones and Cain cohabited.  As the state court correctly concluded, although this would have impeached Cain's claim that Jones introduced her to prostitution, whether she was a prostitute before or after she met Jones was a collateral matter.  The second factor does not weigh in favor of either admission or exclusion because there is simply not enough information in the record to properly judge whether Glenn was a reliable witness or not.  Factor three weighs in favor of admission because had Glenn's testimony been admitted, it would have been easily evaluated by the trier of fact.  Glenn's testimony was not the sole evidence on the question whether Cain was a prostitute before she met Jones, however.  As the state court pointed out, Jones himself testified  he paid Cain for sex the night they met and that Cain had sex with his friend in exchange for money as well; factor four thus does not weigh in favor of admission.  Finally, factor five does not weigh in favor of admission.  Whether Jones introduced Cain to prostitution was not a major part of Jones's defense.  Rather, Jones sought to prove that Cain was injured either by her fall during her struggle with Jones and Jula or her fight with Jula.  Thus, three of the five factors weigh against admission of Glenn's testimony.

Weighing the *Whelchel* factors with the state's interest in exclusion, the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  The court excluded Glenn's testimony as more prejudicial than probative under California Evidence Codes § 352 and correctly found it largely irrelevant to the issues the jury was called upon to decide, whether Jones inflicted the injuries on Cain and whether they were cohabitants.  The jury heard extensive testimony regarding Cain's involvement

in prostitution, and further testimony about Cain traveling to Los Angeles with Glenn to engage in prostitution was repetitive and risked focusing the jury on irrelevant matters.

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Jones is not entitled to relief as to this claim.

> b.   *Exclusion of Evidence Relating to Cain's Prior Injuries*

Jones also complains the state court violated his fair trial and due process rights when it prevented defense counsel from presenting testimony by Glenn about prior injuries Cain had suffered to her face and eyes. (Pet. at 29-33.)  Defense counsel wanted Glenn to testify that Cain had told her Cain's mother had hit her in the face two years before the incident with Jones, and that one year before the incident with Jones, her boyfriend had hit her in the face with a snow globe. (Lodgment No. 2, vol. 1 at 77-79.)  Defense counsel also stated Glenn would testify that Cain's eye was injured in these incidents and that Glenn observed that it had not completely healed by the time of the incident with Jones. (*Id.* at 85-86.)  The purpose of this evidence was to call into question whether the severity of Cain's injuries were attributable to something other than an assault by Jones. (*Id.* at 84-85.)

The trial judge expressed skepticism at defense counsel's claims that Cain's injuries could be attributed to incidents that took place one and two years before. (*Id*. at 84-85.)  The trial judge asked defense counsel if she had an expert prepared to testify that the injuries suffered by Cain could have been caused by the incidents about which Glenn would testify, and counsel stated that she was "working on" that. (*Id*. at 85.)  In the end, the judge permitted counsel to ask Cain whether she had the injuries she claimed Jones inflicted before the incident and whether she had any previous injuries or fractures of her eye. (*Id.* at 92.)  The court stated:

> [THE COURT:] I have to make a decision on relevance grounds.  And I am coming back to, because of the nature of the charges, the actual cause of this injury is relevant.  So I am going to allow cross-examination regarding the specifics of how this injury occurred.
>
> I think Ms. Lacher is free to ask her, you know, by showing the photograph and talking about this injury to the eye, you know, "Did" — "Did you have this bruising a week before? a day before? a year before?  Did you have this swelling?  When did this swelling occur?  Did you have this red in your eye?"  She can go into the details of when this injury to the eye occurred and whether she had a previous fracture to the eye.

/ / /

> I don't think the cause of a previous injury is relevant. I don't think we need to go into the details of it was an ex-boyfriend who threw a snow globe. But you can certainly ask, "Did you" — "have you previously suffered a fracture to that eye or been treated for, you know, this — the cause of any of the injuries that we're seeing here?"
>
> That's the best that I can do right now without hearing any more of the evidence. I think that the cause of this injury is fair game. The specifics of any prior damage is not relevant.
>
> Okay, now with respect to Ms. Glenn, again, about the specifics of seeing her been [sic] beat up by her mother or her ex-boyfriend, I also believe at this point that that's irrelevant. The fact that the victim might have been beaten by somebody else is irrelevant on the issue of her character and how that might play into a defense.
>
> This isn't a situation where she's beating up somebody else and therefore it's relevant to her reputation or character for violence in a self-defense claim. What you are telling me is that other people may have beaten her up. And the only relevance I see to that right now is potential that that was the cause for this injury.
>
> So I am going to exclude that testimony from Ms. Glenn, the fact that the victim told her her mother hit her or her ex-boyfriend hit her.

(*Id.* at 92-93.)

The issue came up again after Cain testified and defense counsel again wanted to ask Cain about prior injuries to her face. Specifically, defense counsel wanted to establish that Cain had prior injuries to her eyes and face from the prior assaults which had not healed and which had rendered her unusually vulnerable to an assault. (Lodgment No. 2, vol. 32 at 313.) The trial judge noted that the emergency room physician had testified that the injuries were recent, no more than a day or two old and reiterated her ruling that, absent any expert testimony that Cain's current injuries could have been caused by the one and two year old incidents, they were irrelevant. (*Id.* at 310-13.) The court noted:

> THE COURT: [...] Let's assume for the sake of argument she had a prior injury that left some sort of old fracture to her eye that left her more susceptible to having a fracture this time around. It doesn't present a defense to the fact that her eye was fractured that night, that it was punched to the extent that it caused the injuries already described by the doctor and shown by the photographs. It is no — even assuming that, it does not relieve the person who caused the injuries on that night of culpability for those injuries, even assuming she was an eggshell victim.

(*Id.* at 315-16.)

In the end, the trial judge permitted defense counsel to ask general questions regarding whether she had the swelling, bruising, bleeding, etc. before the incident alleged, but that absent expert testimony that established the injuries could have been a result of the other, older assaults, the specifics of those prior assaults were irrelevant. (*Id.* at 310-11; 312-13.) Defense counsel did not ask those questions of

21

1 Cain when cross examination resumed.  (*Id.* at 321-32.)

2 As with the previous claim, the Court must weigh the *Whelchel* factors.  *Whelchel*, 232 F.3d at
3 1211.  The probative value of the evidence was weak.  As the state court judge noted, the one-year and
4 two-year-old assaults were irrelevant to the charges because the emergency room doctor, Dr. Davidson,
5 testified Cain's injuries were no more than a few hours old and defense counsel did not have any expert
6 testimony to support the proposition that Cain's current injuries could have been related to the one- and
7 two-year-old injuries. (Lodgment No. 2, vol.2 at 215, 310-11.)  In the absence of such testimony, it was
8 simply speculative.  As with Glenn's other testimony, the reliability of the evidence cannot be evaluated
9 because there is simply not enough information in the record to properly judge whether Glenn was a
10 reliable witness.  Whether the jury would have been capable of evaluating the evidence is not clear.
11 Without expert testimony connecting the old assaults to Cain's current injury, there was a risk the jury
12 would have placed improper weight on such testimony or would have been confused as to the relevance
13 of the evidence.  Glenn's testimony would have been the sole evidence of any prior injury, but, as
14 discussed above, any prior injury was not relevant.  Finally, Glenn's testimony was not a major part of
15 Jones's defense.  The thrust of his defense was that Cain's injuries were either a result of her falling
16 when she chased Jula Jones out of the apartment complex, were inflicted by Jula during their fight, or
17 both.  Any prior injuries to Cain's face and eyes were not part of that defense.

18 The state's interest in excluding the evidence was based primarily on relevance grounds.  As the
19 state court judge noted, there was no evidence supporting the defense theory that the prior assaults were
20 the cause of Cain's current injuries, and defense counsel did not have an expert testimony lined up
21 which would support such a theory.  In addition, the prosecution's medical experts agreed that Cain's
22 injuries could have been at most hours old, not weeks or years.  (Lodgment No. 2, vol. 2 at 215.)
23 Accordingly, the state's interest in excluding irrelevant and confusing evidence was strong.

24 Three of the five *Whelchel* factors weigh against the admission of Glenn's testimony about prior
25 assaults.  Balanced against the state's strong interest in excluding irrelevant and confusing evidence, the
26 Court concludes that the state court's exclusion of this evidence did not violate Jones's due process or
27 fair trial rights.  *Whelchel*, 232 F.3d at 1211.  Accordingly, the state court's denial of this claim was
28 / / /

22

neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. He is not entitled to relief as to this claim.

### 4.    *Failure to Appoint Counsel (claim three)*

Next, Jones claims the trial court violated his Sixth Amendment right to counsel when it refused to appoint counsel for him after he expressed a desire to fire his current counsel. This in turn, Jones alleges, forced him to represent himself. (Pet. at 34-37; Traverse at 15-16.) Respondent contends the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Pet. at 16-19.)

According to Respondent, Jones raised this claim in the habeas corpus petition he filed in the California Supreme Court. (Answer at 2.) That court denied the petition without citation of authority. (Lodgment No. 12.) Accordingly, this Court must conduct and independent review of the record to determine whether the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

The facts surrounding this claim are as follows. During the prosecutor's presentation of rebuttal witness Tenney, Jones asked for a hearing pursuant to *People v. Marsden*[4]. The trial judge told Jones he could not do that in the middle of testimony. (Lodgment No. 2, vol. 4 at 700.) After completing the rebuttal witness's testimony, the judge told Jones that he was not entitled to a *Marsden* hearing because his counsel was retained, not appointed. (*Id.* at 702.) Jones then objected to the jury instructions that all counsel had agreed on. When the judge explained that Jones's counsel was in charge of jury instructions and denied the request, Jones told the judge he wanted to "do [his] presentation himself." (*Id.* at 702-03.) The judge confirmed that Jones was asking to represent himself then directed Jones to fill out the *Lopez*[5] waiver form which explained his rights as well as the risks and consequences of self-representation. (*Id.* at 703-04.)

---

[4] Under *People v. Marsden*, 2 Cal. 3d 118 (1970), criminal defendants in California may ask the court to discharge their appointed attorney and appoint a new attorney when their right to effective representation is jeopardized.

[5] In California, defendants who wish to represent themselves are asked to fill out a document entitled a "*Lopez* waiver," the content of which is based on suggestions made by the court in *People v. Lopez*, 71 Cal. App. 3d 568, 572-74 (1977). The *Lopez* waiver details the rights a defendant gives up when choosing to represent himself and the risks of self-representation.

The trial judge held a brief hearing on Jones's request.  She explained that the request was untimely, having been made at the end of the trial, and that therefore she had the discretion to deny it. (*Id.* at 705.)  She asked Jones why he was making the request, and Jones told her that he was unsatisfied with his counsel's performance in several ways, including her failure to make certain objections and the jury instructions she had agreed to.  (*Id.* at 705-06.)  Jones indicated that he wanted to be able to submit jury instructions on self defense, defense of others and defense of property.  The judge told Jones that she and defense counsel had already agreed that the evidence did not support instructions on self defense and defense of others/property and that, even if she permitted him to represent himself, she would not revisit the jury instructions and she would not give Jones any extra time to prepare; the only thing remaining was instruction and argument.  (*Id.* at 706-08.)  Jones asked whether the court would appoint advisory counsel; the judge told Jones that because he had the means to hire retained counsel, he would not qualify for appointed counsel.  (*Id.* at 707-08.)  In the end, Jones indicated he understood and stated that he still wanted to represent himself.  (*Id.* at 709.)  The judge then went over the *Lopez* waiver with Jones and assured herself that Jones understood what he was doing, the rights he was giving up, the charges and maximum sentence he was facing, and the risks of self-representation.  (*Id.* at 709-15.)  The judge then granted Jones's request to represent himself.  (*Id.* at 715.)

Jones delivered his closing argument and the jury deliberated for about two days before it told the judge that it could not reach a verdict on count three.  (*Id.* at 777-800; Lodgment No. 2, vol. 5, vol 6 at 830-848.)  Following a discussion about amending the verdict forms and charges, Jones asked for counsel to be appointed because he found the issues being discussed were "too complicated for [him] to understand." (Lodgment No. 2, vol. 2 at 849.)  The request was denied as untimely.  (*Id.* at 849-51.) Jones's subsequent request for counsel to be appointed for the purposes of sentencing was granted.  (*Id*. at 888-90.)

Jones argues his decision to represent himself was not voluntary because the trial court's refusal to appoint substitute counsel for him when he expressed his desire to fire his retained counsel forced him to represent himself. (Pet. at 34-37; Traverse at 15-16.)  Under the Sixth and Fourteenth Amendments, a defendant has the right to represent himself.  *See Faretta v. California*, 422 U.S. at  422 U.S. 806, 819-20 (1975).  If a defendant waives counsel and chooses to represent himself, the waiver must be

"knowing, voluntary and intelligent," and he "must be warned specifically of the hazards ahead." *Iowa v. Tovar*, 541 U.S. 77, 88-89 (2004) (citing *Faretta*, 422 U.S. at 806). A waiver is intelligent if "the defendant 'knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). No formal script is required, but courts should consider "a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* at 88-89 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Moreover, although a court *may* appoint advisory counsel when asked, a defendant has no federal constitutional right to advisory counsel. *See McKaskle v. Wiggins*, 465 U.S. 168, 176-77 (1984); *United States v. Mooreland*, 622 F.3d 1147, 1155 (9th Cir. 2010).

In Jones's case, he filled out the waiver form given to him by the trial judge which detailed the charges and the maximum punishment he faced. (Lodgment No. 2, vol. 4 at 703-15.) The judge explained that she would not revisit prior rulings on what instructions would be given to the jury and that she would not grant him additional time to prepare. (*Id.* at 705-09, 712.) She also assured herself that Jones understood the charges against him and the maximum possible sentence he was facing. (*Id.* at 709-10.) She told Jones that he would be treated as any other lawyer would, that he would get no special treatment, no advisor, no investigator, no extra library time, and that the prosecution was represented by a skilled lawyer which made a decision to represent himself very risky. (*Id.* at 711-14.) Finally, she made sure Jones had an adequate educational background and that he was not making an emotional decision but rather one he had thought through. (*Id.* at 714-15.) Under these circumstances, Jones's request to represent himself was knowing, voluntary and intelligent. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

To the extent Jones is arguing the state court improperly denied his request for substitute counsel, his claim is also without merit. The Sixth Amendment guarantees a defendant the right to counsel of choice under certain circumstances. The Ninth Circuit has discussed the clearly established Supreme Court law on this issue as follows:

> The Supreme Court has emphasized . . . that the right to counsel of choice is "circumscribed by several important respects." *Wheat v. United States*, 486 U.S. 153,

159, 108 S.Ct. 1692, 100, L.Ed.2d 140 (1988).  Indeed there are four specific situations

in which the Sixth Amendment does not entitle a defendant to preferred counsel: A defendant does not have the right to be represented by (1) an attorney he cannot afford; (2) an attorney who is not willing to represent the defendant; (3) an attorney with a conflict of interest; or (4) an advocate (other than himself) who is not a member of the bar.  *Id.*  In addition, the Court has established that a trial court requires "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar."  *[United States v.] Gonzalez-Lopez*, 126 S.Ct. at 2565-66 (citation omitted).  As such, trial courts retain the discretion to "make scheduling an other decision that effectively exclude a defendant's first choice of counsel."  *Id.* at 2566.

*Miller*, 525 F.3d at 895.

Because Lacher was retained counsel, Jones had the right to counsel of his choice.  *Id.* at 895.  The Ninth Circuit has identified three factors a court should consider when deciding whether to permit a substitution of retained counsel: (1) whether the defendant had retained new counsel; (2) whether current counsel was prepared and competent to proceed forward; and (3) the timing of defendant's request.  *Id.* at 896-98.  In addition, the trial court had an obligation, under Ninth Circuit authority, to inquire into the problems Jones alleged he was having with Lacher.  *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (citing *Schell v. Witek*, 218 Fl.3d 1017, 1025-26 (9th Cir. 2000)).

The Ninth Circuit in *Miller* denied habeas corpus relief under similar circumstances to those in the present case.  First, in *Miller*, as in Jones's case, the defendant had not retained new counsel at the time of the request.  *See Miller*, 525 F.3d at 896; (Lodgment No. 2, vol. 4 at 702-15).  Second, as in *Miller*, the trial judge assured herself that Lacher was prepared for trial and was competent to proceed.  When Jones made his request to relieve Lacher, the judge permitted Jones to explain the reasons why.  *(See id.* at 705-07.)  The trial judge asked Jones if he wanted to argue his case to the jury even though Lacher was prepared to proceed, to which Jones said yes.  (*Id.* at 703.)  Jones then told the judge that he had "several issues" with Lacher, including that timely objections were not made and the instructions that were central to his defense, self defense, defense of others and defense of property, were not being given to the jury.  (*Id.* at 705-06.)  The judge explained that she agreed with Lacher's conclusion that the evidence presented did not support those instructions and that therefore she would not revisit the jury instruction questions.  (*Id.* at 707.)

Third, Jones's request to substitute counsel was much later than the request made by the defendant in *Miller*, who made it on the eve of trial.  *Miller*, 525 F.3d at 897.  Jones made his request

1    to discharge Lacher and for appointed counsel just before closing arguments were scheduled to begin.

2    (Lodgment No. 2, vol. 4 at 706.)  As in *Miller*, the trial court's refusal to appoint substitute counsel was

3    not the kind of "unreasoning and arbitrary insistence on expeditiousness that clearly established federal

4    law prohibits."  *Miller*, 525 F.3d at 898 (quoting *Daniels v. Woodford*, 428 F.3d 1181, 1200 (9th Cir.

5    2005) and *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)).

6         For the foregoing reasons, the Court concludes the state court's denial of Jones's request for

7    substitute counsel was not contrary to, nor an unreasonable application of, clearly established Supreme

8    Court law.  *Williams*, 529 U.S. at 412-13.  The trial court properly and reasonably applied the factors

9    set forth in *Miller*.  *Miller*, 525 F.3d at 895.  In addition, the trial court made an adequate inquiry into

10   Jones's complaints about Lacher.  *See Plumlee*, 512 F.3d at 1211.

11        5.      *Failure to Instruct on the Defense Theory (claim four)*

12        Jones argues his federal due process and fair trial rights were violated by the trial court's refusal

13   to instruct the jury on the defenses of self defense and defense of others.  (Pet. at 39-41; Traverse at 17-

14   18.)  Respondent argues the claim fails to present a federal question and, in the alternative, is meritless

15   because the state appellate court's denial of the claim was neither contrary to, nor an unreasonable

16   application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 19-24.)

17        Jones raised this claim in his direct appeal.  (Lodgment No. 3 at 21-19.)  The state appellate court

18   denied the claim, stating as follows:

19          We conclude the court did not err or deny Jones's constitutional right to due
            process and a fair trial by refusing to instruct the jury on the defenses of self-defense,
20          defense of other, and defense of property.  Although the court would have been obligated
            to give such instructions had Jones relied on those defenses at trial (*People v. San*
21          *Nicolas*, *supra*, 34 Cal.4th at p. 669), the trial record establishes that during the
            evidentiary phase of the trial when he was represented by retained counsel, Jones did not
22          rely on those defenses.  Rather, as the court correctly found in denying his new trial
            motion (discussed, *ante*), Jones's defense was based on the theory that he did not assault
23          Ashley, who, according to the testimony that he and Jula gave, suffered her injuries
            either when she slipped on the stairs and fell; when she jumped on Jula and screamed
24          out, "Oh shit.  My eye"; or when Jula, in defending herself, pressed her fingernails into
            Ashley's eyes.

25
            Furthermore, although the court would have been obligated to instruct the jury
26          on those defenses had both been supported by substantial evidence and consistent with
            the defense theory of the case (*People v. San Nicholas*, *supra*, 34 Cal.4th at p. 669), the
27          trial record shows that substantial evidence did not support those defenses.  Ashley's
            testimony described in detail a vicious and unprovoked attack by Jones in Hanzy's
28          apartment.  Ashley's testimony was corroborated by Martin's testimony; the audiotape

/ / /

of Martin's 911 call, which was played to the jury; the testimony of San Diego Police Detective Renee Saffles about Martin's statements during Detective Saffles's investigation; Ashley's frightened demeanor at the scene when the police arrived; the nature and extent of Ashely's injuries and the expert medical testimony of Dr. Grover and Dr. Davidson, who opined that Ashley's injuries were consistent with her report of having been assaulted and repeatedly punched in the face; Jones's flight from the scene and disappearance for several months; Jones's telephone calls to Ashley trying to dissuade her from testifying against him; the fact that Jones gave the arresting officer a false name and then tried to run to avoid being arrested; and Jones's statement, "I done screwed up my life," after he was taken into custody.

As already discussed, the defense theory was that Ashley started an altercation with Jula, who defended herself, and Ashley accidentally injured herself or Jula injured her or both. To support this theory, the defense elicited testimony from Jula that she and Ashley ran down the stairs, and Ashley tripped and fell, hitting her head. The defense also elicited testimony from Jula that Jones did not hit Ashley, but instead that, when Ashley got up and tackled Jula, both women fell on the concrete; Ashley then said, "Oh shit. My eye"; and to defend herself, Jula pressed her fingernails into Ashley's eyes.

The defense also elicited testimony from Jones indicating that Ashley accidentally broke the apartment window when Jones tried to take wooden rack from Ashely's hand, and Jones pulled Ashley to the floor to protect them both from the broken glass. Jones also testified that when Ashley attacked Jula, he grabbed Ashley by the shoulders to pull her off Jula and then threw Ashley to the ground, but her face did not hit the ground and he never punched her in the eye.

The foregoing record shows that no substantial evidence supports Jones's claim that he acted in self-defense, in defense of others, or in defense of his property. There is no evidence from which a jury could reasonably find that Ashley was assaulting Jones when, according to his own testimony, he tried to take the wooden rack away from her and then pulled her to the floor to protect them both from broken glass when she accidentally broke the window. There is no evidence from which a jury could reasonably find, if it credited Jones's testimony, that Ashley was trying to assault him when he pulled her off Jula. Jones testified that Ashley was attacking Jula, not him. In any event, Jones testified that Ashley's face did not hit the ground when he threw her down, and thus there is no evidence that he injured Ashley while he was allegedly trying to defend Jula.

There is also no substantial evidence to show that Jones was acting in defense of his car. Jones did testify that when Ashley picked up the wooden rack, she said that Jula "ain't gonna leave in that car or I'm gonna bust you windows out." However, Jones's testimony, if credited by the jury, showed that Ashley was not near his car when she allegedly threatened to damage his car.

The trial record also shows the proposed defenses were inconsistent with the actual defense theory of the case. As already discussed, the defense theory was that Jones did not assault Ashley, but that Ashley injured herself accidentally or Jula injured her or both.

For all of the foregoing reasons, we conclude the court did not err or deny Jones's constitutional rights to due process and a [fair] trial by refusing the instruct the jury on the defenses of self-defense, defense of others, and defense of property. In light of our conclusion, we need not, and do not, address the People's argument that any instructional error was harmless.

(Lodgment No. 6 at 15-18.)

In the context of a trial court's failure to give an instruction on a theory of the defense, the Ninth Circuit has noted that "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness . . . [which] require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (citing *Mathews v. United States*, 485 U.S. 58, 63 (1988) and *California v. Trombetta* , 467 U.S. 479, 485 (1984)). Thus, a "'[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (stating that "[a] criminal defendant is entitled to adequate instructions on his or her theory of defense") (quoting *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976).) Accordingly, the Court recommends rejecting Respondent's argument that Jones fails to state a cognizable federal claim.[6]

Jones's claim, however, fails on the merits. As the state court correctly noted, the evidence in Jones's case did not support instructions on self-defense, defense of others or defense of property. Jula testified that she and Jones arrived at Mia Martin's apartment late in the evening or early in the morning of June 29, 2006. (Lodgment No. 2, vol. 3 at 450.) Jula was sitting in Jones's car outside Martin's apartment when she heard glass breaking. (*Id.* at 456.) Jula went to investigate and saw Cain "flipping out," saying that she had broken a window and would continue to break windows in Jones's car and the apartment and saying that she would "do whatever it takes for [Jones] to be with her [Cain]." (*Id.* at 456-57.) When Cain noticed Jula, she threatened to kill Jula, and threw an unknown object she had in her hand. (*Id.* at 462.) Jula then started to run and Cain chased after her. (*Id.* at 462-63.) Cain tripped and fell, hitting her head on the stairs. (*Id.* at 463-64.) Cain then got up, ran at Jula and jumped on her; both fell to the concrete, with Cain on top of Jula. (*Id.* at 464-65.) Cain then said, "Oh, shit. My eye."

---

[6] Respondent cites *Solis* for the proposition that "there is no 'clearly established' Supreme Court law that requires giving instructions on defenses in non-capital cases." (Mem. of P. & A. Supp. Answer at 23.) *Solis*, however, does not so hold. Rather, the Court in *Solis* simply stated that under *Bashor v. Risely*, "'the failure of a state court to instruct on a *lesser offense* [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding.'" *Solis*, 219 F.3d at 929.

(*Id.* at 465.) Jula called for Jones to help her; Jones pulled Cain off of Jula and pushed her away. (*Id.* at 465-66.) Cain continued to try to attack Jula and Jones, and Jula pushed her fingernails into Cain's eyes in an attempt to defend herself. (*Id.* at 467-68.) Jula pushed so hard her nails broke. (*Id.* at 468.) Jula and Jones then left in Jula's car. (*Id.* at 468-69.) On cross examination, Jula testified that Jones did not punch Cain in the face. (*Id.* at 506.)

Jones testified he arrived, with Jula in his car, at Martin's apartment early in the morning of July 29 to get some money from Martin's boyfriend, Devon Hanzy; Cain was at the apartment. (*Id.* at 581.) While Jones and Hanzy talked, Cain and Martin went outside, then Cain returned to the apartment and asked Jones, "Who is that bitch in the car?" Jones told her that was his wife. (*Id.* at 583-84.) Cain then picked up a wooden rack and said "I'm going to beat that bitch's ass. She ain't gonna leave in that car or I'm gonna bust your windows out." (*Id.* at 585.) Jones tried to get the wooden rack away from Cain, and in the process, Cain punctured the window with it. (*Id.*) Jones then pulled Cain down onto the ground to prevent either of them from getting cut with the broken glass. (*Id.* at 586.) Jones was able to get the wooden rack away from Cain. (*Id.* at 587.) Cain then went down the stairs toward Jones's car and Jula; Jones followed her. (*Id.* at 587-88.) When he arrived at his car, he saw Cain and Jula tumbling around on the ground, with Cain on top. (*Id.* at 593; Lodgment No. 2, vol. 4 at 624.) Jones pulled Cain off of Jula and "slung her to the ground." (Lodgment No. 2, vol. 4 at 626-27.) Jones and Jula got into the car and left. (*Id.* at 628.) Jones denied ever punching Cain in the eye. although he conceded he might have accidentally injured her during the struggle. (*Id.* at 665.)

In California, the defenses of self-defense or defense of another require the following showing:

1.  The defendant reasonably believed that [he or someone else] was in imminent danger of being killed or suffering great bodily injury;

2.  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

AND

3.  The defendant used no more force than was reasonably necessary to defend against that danger.

(CALCRIM 505.)

Jones testified that Cain picked up the wooden rack and threatened to beat Jula and break Jones's

30

car windows.  (*See* Lodgment No. 2, vol. 3 at 585.)  According to Jones, Cain then went downstairs and Jones later saw Cain attacking Jula.  (Lodgment No. 2, vol. 4 at 624-28.)  Jones never testified that Cain attacked him.  (Lodgment No. 2, vol. 3 at 586; vol. 4 at 626-27.)  Thus, no evidence supported a self-defense instruction.

Jones's testimony that he pulled Cain off of Jula and slung her to the ground, however, could be construed as defending Jula from Cain's alleged attack.  The medical testimony, however, contradicted any possibility that Cain's injuries could have been the result of Jones slinging Cain to the ground.  Dr. Ian Grover, emergency room physician, testified that Cain's injuries were consistent with her statements that she was beaten in the face and eyes by Jones and that had Cain's injuries been the result of a fall, other parts of her body would have been injured as well.  Dr. Grover indicated that no other injuries were detected.  (Lodgment No. 2, vol. 2 at 213, 218-19.)  Dr. Terrence Davidson, a surgeon who performed the reconstructive surgery on Cain, also testified that Cain's injuries were consistent with Cain's claim that Jones had beaten her in the face and eye area.  (*Id*. at 340.)  Given that both Jula and Jones testified that Jones never hit Cain, there was insufficient evidence to give the "defense of others" instruction to the jury.

Finally, California permits a defendant to use the degree of force a reasonable person under the circumstances would think was reasonably necessary to prevent imminent injury to property.  In order to establish this defense, the following must be shown:

> 1.  The defendant reasonably believed that he was defending a home against [an intruder] who intended to or tried to . . . violently, or riotously, or tumultuously tried to enter that home intending to commit an act of violence against someone inside;
>
> 2.  The defendant reasonably believed that the danger was imminent;
>
> 3  The defendant reasonably believed that the use of deadly force was necessary to defend against the danger;
>
> AND
>
> 4.  The defendant used no more force than was reasonably necessary to defend against the danger.

(CALCRIM 506.)

This defense was also not supported by the evidence presented.  Jones testified that while he and Cain were on the porch of Martin's apartment, Cain picked up a wooden rack and said  "I'm going to

beat that bitch's ass. She ain't gonna leave in that car or I'm gonna bust your windows out." (Lodgment No. 2, vol. 3 at 585.) Jones tried to get the wooden rack away from Cain, and in the process, Cain punctured the window with it. (*Id.*) Jones then pulled Cain down onto the ground to prevent either of them from getting cut with the broken glass. (*Id.* at 586.) Jones was eventually able to get the wooden rack away from Cain before she went down the stairs toward Jones's car and Jula. (*Id.* at 587-88.) When he arrived at his car, he saw Cain assaulting Jula, pulled Cain off of Jula and slung Cain to the ground. (*Id.*; Lodgment No. 2, vol. 4 at 624-27.) Thus, at the time Jones committed the only act of force on Cain to which he admitted, there was no imminent threat to his property, as Cain was assaulting Jula at the time.

In any event, any instructional error that did occur did not have a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 638. Even if the jury had been instructed on self-defense, defense of others and defense of property, Jones's credibility was severely compromised by his and Jula's claim that Cain's injuries were the result of Jula poking her fingernails into Cain's eyes, Cain tripping down the stairs and/or Jones slinging her to the ground after pulling her off of Jula. Further, even if the jury believed that Jones was acting in self-defense or defense of others or property, there is no likelihood they would have concluded that the force inflicted by Jones was reasonable given the severity of Cain's injuries.

For all the foregoing reasons, the state court's denial of this claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Jones is not entitled to relief as to this claim.

      6.    *Reasonable Doubt Instruction (claim five)*

Jones next argues the reasonable doubt instruction given in his case was unconstitutional. (Pet. at 42-47; Traverse at 19-24.) Specifically, Jones contends that the instruction does not contain "language which defines the degree of persuasion to which 'abiding conviction' must be held," and that "standing alone, it may be reasonably interpreted to embody some degree of persuasion less than 'beyond a reasonable doubt' such as 'clear and convincing evidence.'" (Pet. at 43-44.) Respondent counters that the instruction is sound and the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp.

Answer at 24-26.)

According to Respondent, Jones raised this claim in the petition for review he filed in the California Supreme Court. (Answer at 2.) The Court, however, cannot locate this claim in the petition for review Respondent lodged with the Court. (*See* Lodgment No. 7.) Nor has the Court been able to locate the claim in the habeas corpus petition Jones filed in the California Supreme Court. (*See* Lodgment Nos. 9, 10, 11.) In any event, this Court may deny a habeas petition containing an unexhausted claim if it is "perfectly clear that the applicant does not raise even a colorable claim" *Cassett*, 406 F.3d at 624.

The instruction given to the jury in Jones's case read as follows:

> The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime and special allegations beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must not find him guilty.

(Lodgment No. 1, vol. 1 at 175; CALCRIM No. 220.)

The clearly established United States Supreme Court law regarding the reasonable doubt instruction is *Victor v. Nebraska*, 511 U.S. 1 (1994). In *Victor*, the Supreme Court considered a precursor to the reasonable doubt instruction given in Jones's trial. In analyzing its validity, the Court stated that when considering the constitutional validity of any particular reasonable doubt instruction, a court must determine "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet [due process]." *Id*. at 6; *see also Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998). The *Victor* court noted:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Cf. Hopt v. Utah*, 120 U.S. 430, 440-441, 7 S.Ct. 614, 618-20, 30 L.Ed. 708 (1887). Indeed, so long as the court instructs the jury on the

necessity that the defendant's guilt be proved beyond a reasonable doubt, *see Jackson v.*

*Virginia*, 443 U.S. 307, 320, n. 14, 99 S.Ct. 2781, 2789, n. 14, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Cf. Taylor v. Kentucky*, 436 U.S. 478, 485-486, 98 S.Ct. 1930, 1934-1935, 56 L.Ed.2d 468 (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127. 137, 99 L.Ed. 150 (1954).

*Victor*, 511 U.S. at 5.

The majority in Victor stated that "[a]n instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." *Victor*, 511 U.S. at 14-15 (citing *Hopt v. Utah*, 120 U.S. 430, 439 (1887)); *see also Lisenbee v. Henry*, 166 F.3d 997, 999-1000 (9th Cir. 1999) (citing *Victor*, 511 U.S. at 12-13). Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and Jones is not entitled to relief as to this claim. *Williams*, 529 U.S. at 412-13.

6. *Ineffective Assistance of Appellate Counsel (claim six)*

Jones argues appellate counsel was ineffective in several ways. First, he contends appellate counsel should have argued that pre-trial counsel Bruce Sobel and trial counsel Pamela Lacher were ineffective. Second, he claims appellate counsel should have argued his waiver of counsel, in the context of his request to represent himself, was involuntary. Third, he argues appellate counsel should have argued that the trial court improperly altered the verdict forms during jury deliberations. (Supp. to Pet. at 2-15; Traverse at 25-31.) As to all of these claims, Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law because none of the issues Jones claims appellate counsel should have raised were meritorious. (Mem. of P. & A. Supp. Answer at 26-27.)[7]

Jones raised these claims in the habeas corpus petition he filed in the California Supreme Court.

---

[7] Respondent states that Jones also alleges that appellate counsel was ineffective for failing to argue his Sixth Amendment right to confront and cross examine the witnesses against him when it prevented him from presenting testimony from Lanise Glenn about prior injuries to her eyes that Cain had suffered and for failing to argue the reasonable doubt instruction given to the jury was unconstitutional. (Mem. of P. & A. Supp. Answer at 26.) Although those claims appear in the state habeas corpus petition he filed, the Court has been unable to locate those claims in either the Petition, the Supplement to the Petition or the Traverse filed by Jones in this Court. (*See* Pet., Supp. to Pet., Traverse.)

(Lodgment No. 9.)  That court denied the petition without citation of authority.  (Lodgment No. 12.)  There is no reasoned state court opinion to which this Court can "look through" under *Ylst*.  Accordingly, the Court must conduct and independent review of the record to determine whether the state court's denial of these claims was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

"The proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)).  To establish prejudice in the context of ineffective assistance of appellate counsel, Jones must have shown in state court a reasonable probability that he would have prevailed on appeal absent counsel's errors.  *Smith*, 528 U.S. at 285 (citing *Strickland*, 466 U.S. at 694).  With regard to both claims, "[t]he performance component need not be addressed first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"  *Id.*, n. 144 (quoting *Strickland*, 466 U.S. at 697).

a.      *Ineffective Assistance of Pre-trial and Trial Counsel*

Jones contends appellate counsel should have argued that pre-trial counsel Bruce Sobel and trial counsel Pamela Lacher were ineffective.  (Supp. to Pet. at 6.)  He does not specify how Sobel was ineffective or what prejudice he suffered as a result of any deficiencies on the part of Sobel.  Accordingly, Jones is not entitled to relief as to his claim regarding Sobel's performance.  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (stating that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").

With regard to Lacher's performance, Jones also does not specify how her performance was the deficient or how he was prejudiced by Lacher's deficient performance.  (Supp. to Pet. at 6.)  To the extent Jones is arguing appellate counsel should have raised the instances of ineffective assistance of counsel claims he has independently alleged in his petition, however, the Court concludes the state court's denial of his ineffective assistance of appellate counsel claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  As discussed in Section IV(B)(2) of this Report and Recommendation, the state court's rejection of Jones's claims that trial counsel was ineffective was not contrary to, nor an unreasonable application of, clearly established Supreme Court

law.  (*See* R&R at Section IV(B)(2).)  Accordingly, Jones has not established a reasonable probability that he would have prevailed on appeal absent counsel's errors.  *Smith*, 528 U.S. at 285.  He is not entitled to relief as to this claim.

        b.    *Waiver of Counsel*

      Jones next argues appellate counsel should have argued that his waiver of counsel, in the context of his request to represent himself, was invalid and involuntary.  (Supp. to Pet. at 7-8.)  Appellate counsel did raise the issue of the trial courts' refusal to appoint counsel after Jones, who had been granted the right to represent himself and had delivered his closing argument, decided he needed the assistance of counsel.  (Lodgment No. 3 at 35-42.)  As part of that argument, counsel did contend that Jones asked to represent himself "because he felt he had no other choice after his retained counsel repeatedly demonstrated a lack of competence in the courtroom . . . ."  (*Id.* at 36.)  Thus, the appellate court was certainly made aware of the basis for appellate counsel's claim regarding the trial court's refusal to appoint counsel.  In any event, Jones has not established he was prejudiced by any ineffectiveness on appellate counsel's part because, as discussed in Section IV(B)(4) of this Report and Recommendation, the state court's denial of the claim was reasonable and thus Jones has not shown he would have prevailed on appeal absent counsel's errors.  *Smith*, 528 U.S. at 285.  Accordingly, he is not entitled to relief as to this claim.  *Williams*, 529 U.S. at 412-13.

        c.    *Alteration of Verdict Forms*

      Jones also contends appellate counsel should have attacked the trial court's alteration of the verdict forms during jury deliberations on appeal.  (Supp. to Pet. at 8-15; Traverse at 26-35.)  The facts surrounding this claim are lengty and complex, and detailed below.

      The amended information charged Jones with burglary (count one), mayhem (count two), corporal injury to a spouse or cohabitant (count three) and assault by means likely to produce great bodily injury (count four).  (Lodgment No. 1, vol. 1 at 5-7.)  As to counts one, three and four, the amended information also alleged that Jones personally inflicted great bodily injury on Cain within the meaning of Penal Code § 12022.7(e).  (*Id.*)  That section reads as follows:

        (e) Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be

/ / /

punished by an additional and consecutive term of imprisonment in the state prison for three, four, or five years.  As used in this subdivision, domestic violence has the meaning provided in subdivision (b) of Section 13700.

Cal. Penal Code § 12022.7(e).

California Penal Code § 13700(b) defines "domestic violence" as follows:

(b) "Domestic violence" means abuse committed against an adult or minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship.  For purposes of this subdivision, "cohabitant" means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship.  Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expense, (3) joint use or ownership of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship.

Cal. Penal Code § 13700.

The information also alleged, under a different penal code provision, that Jones had personally inflicted great bodily injury on Cain within the meaning of Penal Code § 1192.7(c)(8).  This charge ensured that Jones's conviction would be counted as a "strike" under California's Three Strikes Law, but did not carry any prison time.  That section read as follows:

(c) As used in this section, "serious felony" means any of the following:

. . . .

(8) any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice; or any felony in which the defendant personally uses a firearm.

Cal. Penal Code § 1192.7(c)(8).

In addition, although not separately charged, the verdict forms given to the jury permitted them to find Jones guilty not only of the 12022.7(e) and 1192.7(c)(8) allegations, but also of the lesser included offense of § 12022.7(a) as to counts one, three and four, but lumped the § 12022.7(a) allegation together with the § 1192.7(c)(8) allegation.  Section 12022.7(a) reads as follows:

(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years.

Cal. Penal Code § 12022.7(a).

Thus, the original verdict forms with regard to the § 12022.7(e) and § 1192.7(c)(8) allegations

that were given to the jury read, in pertinent part, as follows:

> And we further find _____ (true/not true) that in the commission of the above offense, the said defendant, Wydell Durpee [sic] Jones, Jr., personally inflicted great bodily injury upon ASHLEY CAIN, not an accomplice to the above offense under circumstances involving domestic violence, within the meaning of Penal Code section 12022.7(e).

> And we further find _____(true/not true) that in the commission of the above offense, the said defendant, Wydell Durpee [sic] Jones, Jr., personally inflicted great bodily injury upon ASHLEY CAIN, not an accomplice to the above offense, within the meaning of Penal Code section 1192.7(c)(8) and 12022.7(a) (a lesser included offense of 12022.7(e)).

(Lodgment No. 1, vol. 2 at 225-28.)

On the second day of deliberations, the jury sent a note stating that they were "unable to reach a decision concerning count three: re: cohabitation." (Lodgment No. 2, vol. 6 at 830.)  A second note stated that the instructions contained an "[u]nclear definition of cohabitant or spouse." (*Id.*)  The trial judge gave them a clarification of the term "cohabitant" from a California case, *People v. Taylor*, 118 Cal. App. 4th 11 (2004). (*Id.* at 831-34.)  Later that morning, the jury sent out another note indicating they were deadlocked on the question whether Jones and Cain cohabited. (*Id.* at 835.)  The entirety of the note read as follows:

> The jury is unable to unanimously agree that the defendant and Ashley cohabited. How do we complete the verdict forms regarding cohabitation and domestic violence? We are divided as to whether the defendant and Ashley cohabited, and therefore cannot state "true" or "not true" as to portions of the verdict forms.  If we cannot unanimously agree one way or the other as to count three, what is the correct way to fill out the fourth blank of the verdict form for the first cause of action, burglary, for example?  We think we fill in "not true."

(*Id.*)

The trial judge first said that she would instruct the jury that cohabitation was an element of the crime charged in count three, and that if they could not agree on whether Cain and Jones cohabited, they should leave the verdict form for count three blank. (*Id.* at 835-36.)  With regard to the allegations, however, there was a complication because the definition of "cohabiting" for purposes of count three's charge of corporal injury to a spouse or cohabitant, was different from the definition of "domestic violence" for purposes of the Penal Code § 12022.7(e) allegation, which included a dating relationship. (*Id.* at 836.)  The trial judge summed up the problem this way:

> [THE COURT]: So I believe that I need to direct them to [the 12022.7(e)] instruction and the fact that it involves both cohabitants and dating relationships, and

they need to discuss that further to decide whether or nor they can all agree whether domestic violence as defined by this allegation, which is different, is true or not true.

MS. COOPER: Okay.

THE COURT: And if they can't — they still cannot agree, that they should leave that blank 'cause he's indicating here, "We think we should fill in 'not true.'" and that's not the case unless all 12 of them don't find it.  So that they need to leave that blank.

That leaves, however, the LIO [lesser included offense] of 12022.7(a), which is also independently alleged as 1192.7.  So they can still make a finding of the 1192.7 even though they can't agree on the 12022.7(e).  But they can't go to the LIO if the haven't reached a verdict on the (e).

(*Id.* at 836.)

At this point, the prosecutor expressed her concern that the case was "clearly a [great bodily injury] case," and that "it would be silly if just because they don't find the [domestic violence] aspect, we can't get the additional time punishments for the injuries he inflicted because we didn't separately charge a 12022.7(a) and we only charged the 1192.7(c)(8)." (*Id.* 837.)  The prosecutor suggested adding the Penal Code 12022.7(a) charge because it had the same elements as the 1192.7(c)(8) charge.  (*Id.*)

The prosecutor expressed her concern that the § 12022.7(a) charge carried a prison sentence while the § 1192.7(c)(8) charge did not, and that "if the only hang up on [the 12022.7(e) charge] isn't the fact that he had the [great bodily injury], it's the [domestic violence] aspect of it, I think the [12022.7(a)] should still be able to be found because it's essentially the same as the (c)(8)." (*Id.* at 838.)  The court and counsel initially agreed to amend the verdict forms for counts one and four to separate out  the allegation for the lesser included offense of 12022.7(a).  (*Id.* at 840-43.)  A recess was called to research the question of whether the prosecution could simply amend the information to allege the lesser included offense of 12022.7(a).  (*Id.*)

When court reconvened, the trial judge informed the parties that the jury had sent out another note.  That note read as follows;

The jury requests clarification as to whether a finding of guilty is required for each of the three counts of #1, 3 and 4 as a prerequisite for a finding that the defendant is guilty of domestic violence and/or great bodily injury.  Please confirm that the word

"and" on the first line of Jury instructions #3163 and 3160 is correct or whether "and" should be revised to read "or."

(*Id.* at 843.)

1   The first line of the jury instruction for both the § 12022.7(e) allegation and the §§ 12022.7(a)

2   and 1192.7(c)(8) allegations read, "If you find the defendant guilty of the crimes charged in Counts One,

3   Three *and* Four, you must then decide, whether, for each crime, the People have proved the additional

4   allegation alleged pursuant to Penal Code section 12022.7(e) . . . ." (Lodgment No. 1, vol. 1 at 190)

5   (emphasis added). The judge concluded the note indicated the jury was "confused, thinking that in order

6   to go on to the allegations, [they] have to find guilt in all three of those counts, because it says Counts

7   1, 3 and 4 rather than 1, 3 or 4." (*Id.*) The judge and the prosecutor agreed the word "and" in the

8   instruction was incorrect and should have instead read "or," and agreed the judge would clarify that for

9   the jury. As to the amendment issue, after reviewing California Penal Code § 1009 and *People v.*

10   *Bolden*, 44 Cal. App. 4th 707 (1996), the judge granted the prosecutor's motion to amend the 12022.7(e)

11   allegation to allege a 12022.7(a) allegation instead. California Penal Code states, in pertinent part:

12          [. . .] The court in which an action is pending may order or permit an
       amendment of an indictment, accusation, or information, or the filing of an amended
13       complaint, for any defect or insufficiency, at any stage of the proceedings . . . . An
       indictment or accusation cannot be amended so as to change the offense charged, nor
14       an information so as to charge an offense not shown by the evidence taken at the
       preliminary examination. A complaint cannot be amended to charge an offense not
15       attempted to be charged by the original complaint, except that separate counts may be
       added which might properly have been joined in the original complaint. . . .
16

17   Cal. Penal Code § 1009.

18          Applying Penal Code § 1009 to a situation similar to Jones's, *Bolden* found no error where a trial

19   court permitted an amendment to charge a different subdivision of the arson statute in order to comply

20   with a recently decided case after the case had been submitted to the jury. *Bolden*, 44 Cal. App. 4th at

21   716 (finding no error where the information was amended with a statute which included all of the

22   elements of the previously alleged statute and a was a lesser included offense of the prior statute); *see*

23   *also People v. Birks*, 19 Cal. 4th 108, 129 (1998) (stating that amendment is permissible as late as the

24   close of trial so long as the defendant's substantial rights are not prejudiced).

25          Pursuant to these authorities, the trial judge permitted the prosecutor to amend the information

26   to alter the § 12022.7(e) to a § 12022.7(a) allegation. (Lodgment No. 2, vol. 6 at 84446.) The verdict

27   forms were also altered to delete the 12022.7(e) allegation from counts one, three and four and provide

28   a separate verdict for the 12022.7(a) allegation. (Lodgment No. 1, vol. 2 at 21624.) The jury

1   deadlocked on count three and thus did not decide the allegations as to that count.  They found Jones

2   guilty of counts one, two and four and found the 12022.7(a) and the 1192.7(c)(8) allegations as to counts

3   one and four true.  (Lodgment No. 1, vol. 2 at 216-24; Lodgment No. 2, vol. 6 at 857-63.)

4       Jones contends the alteration of the verdict forms violated his due process rights because the

5   lesser included offense of Penal Code § 12022.7(a) was not "pled and proven," and that appellate

6   counsel was ineffective for failing to raise this claim on appeal.  (Supp. to Pet. at 9-14.)  Jones also

7   claims appellate counsel should have argued the jury was precluded from reaching a verdict on the

8   § 12022.7(a) charge because they had not acquitted him of the § 12022.7(e) charge, a procedure

9   prohibited by California law.  (Traverse at 26; *People v. Hunter*, 49 Cal.3d 957, 975-76 (1989).)

10       "The Sixth Amendment guarantees a criminal defendant the fundamental right to be clearly

11   informed of the nature and course of the charges in order to permit adequate preparation of a defense."

12   *See Stephens v. Borg*, 95 F.3d 932, 934-35 (9th Cir. 1995) (citing *Sheppard v. Rees*, 909 F.2d 1234,

13   1236 (9th Cir.1990)).  Jones was "clearly informed of the nature and course of the charges" by the

14   information filed against him, which contained the allegation that he personally inflicted great bodily

15   injury within the meaning of Penal Code § 1192.7(c)(8), which contains the same elements as the Penal

16   Code § 12022.7(a) allegation.  (*See* Lodgment No. 1, vol. 1 at 200 [great bodily injury jury instruction

17   for Penal Code §§ 1192.7(c)(8) and 12022.7(a)].)  Accordingly, Jones has not established he was

18   prejudiced by counsel's failure to include this claim in his direct appeal because he has not established

19   a reasonable probability the result of the proceeding would have been different had counsel done so.

20   *Smith*, 528 U.S. at 285.

21       As to Jones's complaint that the jury was permitted to consider a lesser included offense before

22   acquitting him of the greater offense, which is prohibited under California law, Jones is incorrect.  The

23   § 12022.7(e) allegation was removed from the jury's consideration and replaced by the § 12022.7(a)

24   allegation.  In any event, appellate counsel would not have been able to establish prejudice from any

25   alleged error because, as the prosecutor and trial judge pointed out, the jury's questions indicated they

26   were unable to agree whether Jones and Cain were cohabitants, not whether Cain suffered serious bodily

27   injury.  Further, the jury independently concluded, beyond a reasonable doubt, that Jones had personally

28   inflicted great bodily injury on Cain because they found the Penal Code § 1192.7(c)(8) allegation to be

true.  (*See* Lodgment No. 1, vol. 2 at 216-22.)  Thus, Jones has not established appellate counsel was ineffective because he has not show a reasonable probability the result of the proceeding would have been different had counsel raised this claim on direct appeal.  *Smith*, 528 U.S. at 285.

For all the foregoing reasons, the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Jones is not entitled to relief as to this claim.

### 7.    *Imposition of the Aggravated Sentencing Term (claim seven)*

Finally, Jones argues the state court's imposition of the aggravated prison term violated his Sixth Amendment right to have every fact which elevates the maximum prison term to which a defendant can be sentenced be found by a jury beyond a reasonable doubt.  *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Cunningham v. California*, 549 U.S. 270, 291 (2007).  Respondent counters that Jones's sentence does not afoul of this requirement because the state trail judge based her imposition of the upper term on Jones's numerous prior convictions, citing *Almendrez-Torres v. United States*, 523 U.S. 224, 243 (1998).  (Mem. of P. & A. Supp. Answer at 27-29.)

Jones raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 7.)  That court denied the petition without citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" to the California Appellate Court opinion denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court wrote:

> Citing [*People v. Black*, 41 Cal.4th 799, 813 (2007)], Jones acknowledges the California Supreme Court's decision in *Black II* holds that the imposition of an aggravated sentence based on a defendant's criminal history does not implicate the Sixth Amendment right to a jury trial. He asserts, however, that *Black II* was wrongly decided. This assertion is unavailing, as this court is bound by the California Supreme Court's holding and rationale in *Black II*.  (See *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County*, (1962) 57 Cal.2d 450, 455.)

> Here, in imposing the upper term as to counts 1, 2 and 4, the court specifically noted Jones's numerous and undisputed prior convictions.  Because those convictions alone were a sufficient basis to make him eligible for the upper terms, we are compelled under *Black II* to conclude Jones suffered no Sixth Amendment violation by the trial court's exercise of its discretion in selecting the upper term in his case based on facts determined by the court.  (*Black II*, *supra*, 41 Cal.4th at p. 820.)

(Lodgment No. 6 at 30-31.)

In a series of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme

42

Court declared that any fact, other than a prior conviction, that increases the sentence for a crime beyond the statutory maximum must be proved beyond a reasonable doubt or admitted to by the defendant. *See Cunningham v. California*, 549 U.S. 270, 274-75 (2007) (citing *Apprendi*, 530 U.S. 466 and *Blakely v. Washington*, 542 U.S. 296, 303 (2004)); *see also United States v. Booker*, 543 U.S. 220 (2005). The Ninth Circuit has stated, however, that "if at least one of the aggravating factors upon which the judge relied in sentencing ...was established in a manner consistent with the Sixth Amendment, [a] sentence does not violate the Constitution." *Butler v. Curry*, 528 F.3d 624, 643 (9th Cir. 2008); *see also People v. Osband*, 13 Cal. 4th 622, 728 (1996), *People v. Forster*, 29 Cal. App. 4th 1746 (1994), and *People v. Piceno* 195 Cal. App. 3d 1353 (1987).)

Rule 4.421 of the California Rules of Court governs the circumstances in aggravation which justify an upper term. The trial judge stated the following in imposing the upper term:

> [THE COURT]: With respect to the appropriate term — and I know Mr. Leahy wasn't the trial attorney on this, but this was a pretty egregious attack of breaking into a home where a young woman was sound [asleep], dragging her out of the closet and brutally beating her while she tried and tried to get away from closet to bedroom to kitchen, being kicked in the face with boots, and causing not only serious injury but a permanent injury to her eye. It just really was, quite frankly, incredibly brutal. That certainly is something to consider.
>
> But I think, more appropriately, in looking at the factors in aggravation, I'm looking at his prior criminal history that goes back to 1985. Over 20 years of criminal activity, convictions for weapons offenses, theft offenses, violence and drugs. Just about the whole gambit of criminal activity for the last 20-plus years.
>
> And I am not considering the two crimes that are the subject of the prison priors in that evaluation. Even taking those out, there's a substantial criminal history that's been documented by conviction. And in addition, the defendant was on parole when he committed this crime. I find no circumstances in mitigation, and for that reason I am imposing the upper term of 6 years on Count 1 with three years consecutive for the 12022.7.

(Lodgment No. 2, vol. 6 at 921.)

Thus, the trial court imposed the upper term on the burglary count, count one, based on the following aggravating factors: (1) the egregiousness of the attack; (2) the serious and permanent injury to the victim's eye; and (3) Jones's prior criminal history, which included "over 20 years of criminal activity," which constituted a "substantial criminal history." (Lodgment No. 2, vol. 6 at 921.) California Rules of Court, Rules 4.421(a)(1) and (b)(1) state the following are circumstances in aggravation:

> (a) Factors relating to the crime, whether or not charged or chargeable as enhancements include that:

43

(1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness.

. . . .

(b) Factors relating to the defendant include that:

(1) The defendant has engaged in violent conduct that indicates a serious danger to society;

(2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous and of increasing seriousness.

(3) The defendant has served a prior prison term.

Cal. R. Ct. 4.421(a)(1) and (b) (1) - (3).

The jury found beyond a reasonable doubt that Jones had personally inflicted great bodily harm when they found him guilty of violating Penal Code §§ 1192.7 and 12022.7(a). (Lodgment No. 1, vol. 2 216-24.) Thus, at least one aggravating factor, Cal. R. Ct. 4.421(a)(1) was found in a manner consistent with *Cunningham*. Accordingly, there was no *Cunningham* violation. *See Butler*, 528 F.3d at 643.

Moreover, even if the imposition of the aggravated term violated *Cunningham*, the error was harmless. *Cunningham* violations are subject to the harmless error analysis prescribed by *Brecht*, 507 U.S. 619. *See Butler*, 528 F.3d at 648. *Brecht* requires the Court to determine whether "the error had a substantial and injurious effect on [Jones's] sentence." *Id.* (quoting *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001)). "Under that standard, we must grant relief if we are in 'grave doubt' as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt. *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). Given Jones's convictions for burglary, mayhem, and assault by means likely to produce great bodily injury, as well as his criminal history, the Court is confident that a jury would have found the aggravating circumstances outlined in Cal. R. Ct. 4.421(a)(1) and (b)(1) - (3) in a manner consistent with *Cunningham* and the Sixth Amendment. *See Butler*, 528 F.3d at 648-49. The crimes of which Jones was convicted unequivocally "involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness," and were "violent conduct that indicates a serious danger to society." Cal. R. Ct.

4.421(a)(1), (b)(1).  In addition, there is no question in the Court's mind that the jury would have also concluded in a manner consistent with *Cunningham* that Jones's prior convictions for possession of marijuana, possession of cocaine for sale, assault with a deadly weapon and being a felon in possession of ammunition, as well as his current convictions establish that his convictions are "of increasing seriousness."  Cal. R. Ct. 4.421 (b)(2); *see also People v. Clark*, 12 Cal. App. 4th 663, 666 (1992) (stating that "[t]he offense for which a defendant is being sentenced may be considered in determining that his or her convictions are of increasing seriousness.")  Accordingly, any *Cunningham* violation was harmless.  *See Butler*, 528 F.3d at 643.

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13. Jones is not entitled to relief as to this claim.

## IV.    **CONCLUSION**

The Court submits this Report and Recommendation to United States District Michael M Anello under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California. For the reasons outlined above, IT IS HEREBY RECOMMENDED that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the request for an evidentiary hearing and **DENYING** Petition for Writ of Habeas Corpus.

IT IS ORDERED that no later than **June 21, 2011** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

45

1      IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and

2    served on all parties no later than **July 12, 2011**. The parties are advised that failure to file objections

3    within the specified time may waive the right to raise those objections on appeal of the Court's order.

4    *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th

5    Cir. 1991).

6          **IT IS SO ORDERED.**

7    DATED: May 31, 2011                                    _____

8                                                                    Bernard G. Skomal
                                                                   United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46